UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
AUG - 5 2005
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

AGUSTÍN AGUAYO
HHC 1-18 INF
CMR 464 Box 1350
APO, AE 09226,

        Petitioner,

v.

DR. FRANCIS J. HARVEY
Secretary of the Army
101 Army Pentagon
Washington, DC 20310-0101,

        Respondent.

CASE NUMBER 1:05CV01580

JUDGE: Emmet G. Sullivan

DECK TYPE: Habeas Corpus/2255

DATE STAMP: 08/05/2005

## PETITION FOR A WRIT OF HABEAS CORPUS
## BY A PERSON IN MILITARY CUSTODY

Agustín Aguayo petitions this Court for a Writ of Habeas Corpus challenging military custody on the grounds that his application for discharge as a conscientious objector has been wrongfully denied. In support of his petition, he states:

1.     The petitioner, Agustín Aguayo, is an enlisted member of the United States Army, stationed and residing in Schweinfurt, Germany. He is a citizen of the United States.

2.     Mr. Aguayo is assigned to the Army's First Infantry Division, 1-18th Infantry, Company HHC, which is located in Schweinfurt, Germany.

3.     Respondent Francis J. Harvey, Secretary of the Army, is the official of the United States government charged with the control and administration of all Army personnel and affairs wherever situated or assigned. He is sued in his official capacity.

1

## JURISDICTIONAL ALLEGATIONS

4. This Court has jurisdiction to issue a writ of habeas corpus and to grant relief as law and justice require under 28 U.S.C. §§ 2241(a),(c)(1), 2243, in that:

   a. The petitioner is "in custody under or by color of the authority of the United States," because he is an enlisted member of the United States Army. He is currently stationed in Germany.

   b. The petitioner's custodian, the respondent, has the ability to produce the petitioner's body before this Court. Although the respondent's office is located at the Pentagon, which is in Arlington, Virginia, his mailing address is in Washington, D.C., within the territorial jurisdiction of this Court.

## FACTUAL ALLEGATIONS
## INCLUDING EXHAUSTION OF REMEDIES

5. Agustín Aguayo was not a conscientious objector in November 2002, when he enlisted in the Army's Delayed Entry Program as a "Healthcare Specialist" through the Delayed Entry Program. Nor was he a conscientious objector on January 13, 2003, when he reported to the Los Angeles Military Entrance Processing Station ("MEPS") for active duty. At that time, he was experiencing financial difficulties and was looking for a way to supplement his income and broaden his academic options. He enlisted without ever considering the morality of war, or even whether he might one day be called upon to participate in a war.

6. After Mr. Aguayo completed basic training on March 28, 2003, he began his advanced individual training ("AIT") as a "Combat Medic" at Ft. Sam Houston, Texas. He completed his AIT on July 22, 2003 as was assigned to the Army's First Infantry Division, 1-18th Infantry, Company HHC, which is located in Schweinfurt, Germany. In Germany, his job title was "Trauma Specialist."

2

7. Shortly after he enlisted, Mr. Aguayo began to have doubts about the wisdom of his decision. He initially brushed aside those doubts as normal feelings of homesickness. As his military training progressed, the feelings did not go away; they became stronger. He began to think about the things his father (who was a Jehovah's Witness and a pacifist) had taught him, and realized that he was unable to stab or shoot anyone. He put it this way in his application for discharge as a conscientious objector:

> Shortly after being inducted into basic training and especially after being introduced to arms I realized what the Army was truly about. My morals shouted to the very core of my conscience and soul that this was wrong. Progressively it has become overwhelming. I can NO LONGER deny myself. To remain loyal to my convictions, I cannot be part of the army [sic] whether as an active participant or a [sic] unwilling bystander. I have always had strong feelings about war. I didn't like the idea of people killing each other. However, it wasn't till I joined the army that those "feelings" changed into full fledged objections. I realized that I could not hurt, injure, or kill anyone under any circumstances. I realized that I could not participate in any war and that I could not be a part of this entity based on my objections and morals.

8. Agustin Aguayo's deeply-held moral beliefs eventually developed to the point that they prevented him from remaining in the Army, because they prohibit him from participating in war in any form, either as a combatant or as a non-combatant. Mr. Aguayo explained his beliefs in his application for conscientious objector discharge in the following way:

> My moral view does not allow me to take the life of another human being. Human life and preserving it is of utmost importance to me. I could not possibly contemplate the notion of causing personal harm to others or assisting others in doing so. This also includes participating in any organized movement in a combat zone. I believe that violence of any kind, or supporting thereof, for example being a combat medic (assisting the injured to later go back to a combat area) is not acceptable. My conscience will not allow me to continue down this path. I believe that everyone has some value and I do not believe it is my place to take anyone's life. I cannot walk into any situation and assume responsibility of judge, juror and executioner. I have come to realize that it is not my place to hurt someone or end their life under any circumstance. I believe that there are higher forces which handle these situations.

9. Once he realized that he could not serve in the Army, Mr. Aguayo did not immediately apply for discharge as a conscientious objector because he was not aware of that option. Once he learned about the Army's conscientious objector regulation, he prepared his application for discharge and submitted it several days later, on February 9, 2004.

10. Once he submitted his application for discharge, the Army investigated his claim as provided in Army Regulation ("AR") 600-43.

11. As required by AR 600-43 ¶ 2-1*e*, Mr. Aguayo was interviewed by a chaplain and a psychologist. The chaplain reported that Mr. Aguayo's mother was Roman Catholic and that his father was a Jehovah's Witness, but that Mr. Aguayo's own personal beliefs did not grow out of his identification with any organized religion. The chaplain also reported that while Mr. Aguayo "expressed concern about his ability to be able to take a life in combat" when he was considering enlisting, he enlisted "as a medic, thinking it would lessen his conflict," and that "he would be able to work through this conflict." The chaplain concluded that Mr. "Aguayo seems to be sincere in his beliefs although the timing of his request makes it questionable." The psychologist found that Mr. Aguayo "does not have a mental health condition which would warrant discharge through medical channels."

12. Pursuant to AR 600-43 ¶ 2-4.*a.*, the Army appointed Captain Sean D. Foster to investigate Mr. Aguayo's application.

13. On March 14, 2004, Captain Foster conducted a hearing on Mr. Aguayo's application for discharge, as required by AR 600-43, ¶ 2-5*a*. At that hearing, which was conducted at Vanguard Base in Tikrit, Iraq, Captain Foster interviewed Mr. Aguayo as well as four witnesses, Specialist Lopez, Private First Class Benson, Staff Sergeant Campbell, and

4

Sergeant First Class Gentry. Each of these witnesses testified that he believed Mr. Aguayo to sincerely hold his stated beliefs.

14. On March 20, 2004, Captain Foster submitted a written report to the Army. In that report, Captain Foster made the following findings:

> 1 – That PFC Aguayo seems to have a legitimate moral dilemma concerning his role in the military.
>
> A – After reviewing all of the evidence presented, along with all the testimonies made during PFC Aguayo's hearing, it seemed clear to me that PFC Aguayo is absolutely sincere in his stated beliefs that he is opposed to "war in any form". In the testimony given by both PFC Aguayo and his platoon sergeant, SFC Gentry, it became clear to me that PFC Aguayo's role as a "Healthcare Provider" was probably not well-defined by his recruiter and that PFC Aguayo was led to believe he would be performing duties in a healthcare facility such as a hospital. After finding out what his actual job would be as a medic, PFC Aguayo began to have doubts in his mind as to whether he could truly perform those duties. Despite these doubts, he continued to try to do his job the best that he could because, in his own words, he did not want to disappoint his family or his fellow soldiers. His objection was one that grew over time beginning in basic training and solidifying during the Convoy Livefire Exercises during gunnery October 2003. His objection is not based on religious reasons, but rather an internal moral dilemma that, to me, became very evident during the hearing. (The soldier was on the verge of tears through a great deal of the hearing.) Testimony during the hearing, interview with Chaplain Douglas Downs, information submitted in accordance with Annex B, AR 600-43, and letters from individuals that know PFC Aguayo support PFC Aguayo's stated beliefs that he has such an internal conflict that he cannot continue on with his current duties effectively.

15. Captain Foster concluded his report by recommending that the Army discharge Mr. Aguayo as a conscientious objector.

16. Captain Foster's findings and recommendation were approved by the officer who appointed him, Colonel Randal A. Dragon.

17. Because Captain Foster and Colonel Dragon both recommended approval of his application for discharge, Mr. Aguayo submitted no rebuttal, as would have been his right under AR 600-43 ¶ 2-5.*m*.

18. After the officer appointed by the Army to investigate his application for discharge as a conscientious objector had recommended approval of that application, Mr. Aguayo's file was forwarded through the chain of command as required by AR 600-43 ¶ 2-6.

19. Several officers Mr. Aguayo's command eventually recommended that his application for discharge as a conscientious objector be denied. None of these officers ever personally interviewed Mr. Aguayo concerning his beliefs. Other than Lieutenant Colonel Sinclair, none of them even met Mr. Aguayo. Every officer who actually interviewed Mr. Aguayo concerning his conscientious objector beliefs found him to be sincere.

20. On April 29, 2004, Lieutenant Colonel Jeffrey A. Sinclair, the commanding officer of the 18th Infantry Regiment of the 1st Battalion of the 2d Brigade of the Army's 1st Infantry Division submitted a written memorandum recommending disapproval of Mr. Aguayo's application for discharge. Lieutenant Colonel Sinclair supported his recommendation with the following justifications:

> 2. Although I feel that the service member has a genuine desire to obtain release from the military, and the combat theater in Iraq, these reasons do not in themselves constitute qualification for conscientious objector status. I feel this soldier, by his own assessment, is not well-suited for the profession of arms. His intentions for enlisting in the U.S. Military were clearly for the purpose of employment and an opportunity to advance the qualify of life for his family.

> 3. FPC Aguayo's MOS, 91W, supports his desire to help people. In his mind, the psychological impact of being deployed in a combat theater and separated from his family, outweigh the benefits associated with military service. I think this soldier is intelligent, mature, and dedicated to the values of our Country. The true motivation of any individual is difficult to determine, but my assessment is that PFC Aguayo can contribute IAW [*i.e.*, "in accordance with"] with his original contract. His pursuit of

6

>conscientious objector status is an attempt to remedy his anxiety all soldiers face during an extended deployment in a combat theater of operations.

Lieutenant Colonel Sinclair cited no evidence from the application, the investigation, or the hearing record to support these "feel[ings]."

21. On May 9, 2004, despite his earlier approval of Captain Foster's recommendation, Colonel Randal A. Dragon submitted a recommended that Mr. Aguayo's application be disapproved. The rationale Colonel Dragon provided was as follows: "Concur w/Bn Cdr. Do not believe that soldier's belief is consistent w/ conscientious objection." Colonel Dragon did not identify the inconsistency to which he alluded.

22. On May 23, 2004, Major General John R. S. Batiste, the commanding officer of the Army's 1st Infantry Division recommended disapproval of Mr. Aguayo's application. Although Major General Batiste did not provide any reasons for his recommendation, attached to his recommendation was a memorandum from Lieutenant Colonel Stuart W. Risch, Staff Judge Advocate, which recommended disapproval for the following reasons:

>a. PFC Aguayo's convictions do not appear to be sincerely held. CPT Foster conducted an extensive interview with PFC Aguayo and a thorough investigation into his background. PFC Aguayo is a medic. He has not persuasively shown how his duties as a medic are incompatible with his newly discovered beliefs, other than stating he feels he was misled by his recruiter, and he expected to work in a hospital. The timing of his application raises doubts as well. Only days prior to his unit's deployment to Iraq, PFC Aguayo submitted his application. Chaplain Downs agreed that "the timing of his request makes it questionable." In addition, PFC Aguayo is applying for CO Status (1-O) together with his friend, also a medic, PFC Benson.

>b. PFC Aguayo did not identify any specific ways he has altered his behavior to accommodate his beliefs. Although practicing a religion is not a requirement for CO approval, PFC Aguayo has not discussed any equally significant source of his beliefs other than he was raised in a kind and respectful family. The evidence shows PFC Aguayo performing well as a medic. As stated by the battalion commander, LTC Sinclair, he desires to get out of the deployment and the Army, and he is using this process in an attempt to end his service early.

7

23. On June 9, 2004, Lieutenant Cala informed Mr. Aguayo that several officers had recommended disapproval of his application for discharge. At Lieutenant Cala's request, Mr. Aguayo signed a statement to the effect that he had received a copy of Major General Batiste's recommendation, even though in fact he had not. Mr. Aguayo signed the statement because Lieutenant Cala promised Mr. Aguayo that he would soon receive a copy of this recommendation.

24. When Mr. Aguayo had not received copies of the negative recommendations by June 15, 2004, he wrote a memorandum to his chain of command in which he explained that he understood from Lieutenant Cala that several officers had submitted negative recommendations concerning his application for discharge and requested copies of those recommendations.

25. On June 19, 2004, Mr. Aguayo received a copy of Major General Batiste's recommendation. The copy which Mr. Aguayo received did not have attached to it the memorandum from Lieutenant Colonel Stuart W. Risch, Staff Judge Advocate, which (apparently) provided the reasons for Major General Batiste's recommendation.

26. On June 21, 2004, Mr. Aguayo wrote a memorandum to his chain of command explaining that he had received Major General Batiste's recommendation, but that he had not yet received Lieutenant Colonel Sinclair's recommendation. Mr. Aguayo's memorandum requested a copy of Lieutenant Colonel Sinclair's recommendation.

27. On June 24, 2004, Mr. Aguayo submitted a rebuttal to Major General Batiste's recommendation. The rebuttal asked the Army not to consider Major General Batiste's recommendation, because it was not supported by any reasoning. It also requested a copy of Lieutenant Colonel Sinclair's recommendation. On July 9, 2004, after the rebuttal had traveled to several camps in Iraq, Staff Sergeant Campbell returned it to Mr. Aguayo without explanation.

8

28. On July 9, 2004, Mr. Aguayo received Lieutenant Sinclair's recommendation.

29. On July 14, 2004, Mr. Aguayo submitted a rebuttal to Lieutenant Sinclair's recommendation. That same day, the Army returned the rebuttal to Mr. Aguayo, explaining that because Mr. Aguayo's application for discharge had already been submitted to the Department of the Army, he (Mr. Aguayo) could not submit a rebuttal.

30. On July 14, 2004, Mr. Aguayo attempted to resubmit his rebuttal to Major General Batiste's recommendation. Staff Sergeant Campbell returned this rebuttal to Mr. Aguayo that same day, explaining that because Mr. Aguayo's application for discharge had already been submitted to the Department of the Army, he (Mr. Aguayo) could not submit a rebuttal.

31. On July 14, 2004, Mr. Aguayo wrote letters to his Senators, Dianne Feinstein and Barbara Boxer, complaining that he had not been given an opportunity to rebut negative recommendations.

32. On July 14, 2004, Mr. Aguayo wrote a letter to the Army's Congressional Coordinator in which he discussed the Army's refusal to accept his rebuttals to the negative recommendations. Along with the letter, he enclosed copies of his rebuttals to the recommendations of Major General Batiste and Lieutenant Colonel Sinclair.

33. On July 30, 2004, the Army officially denied Mr. Aguayo's application for discharge as a conscientious objector. The Army's denial letter reads in full:

> 1. The DA [Department of the Army] Conscientious Objector Review Board (DACORB) has reviewed the application of PFC Agustin Aguayo for Conscientious Objector Status (CORB).
>
> 2. After thorough examination of the Case Record, the DACORB determined that the applicant did not present convincing evidence, IAW 600-43, that the applicant's stated beliefs warrant award of 1-O status.
>
> 3. A copy of the case record will be included in the OMPF, CMIF, and MPRJIAW AR 640-10.

9

BY ORDER OF THE SECRETARY OF THE ARMY

(It was signed by Colonel Donald W. Browne, Jr., President of the Army's Conscientious Objector Review Board.)

34. On August 15, 2004, Sergeant First Class Gentry gave Mr. Aguayo copies of the recommendations of Lieutenant Colonel Stuart W. Risch, Staff Judge Advocate, and Colonel Dragon. That same day, with Lieutenant Weightman and Sergeant First Class Gentry looking on, Captain Grissom told Mr. Aguayo that if he submitted rebuttals to these recommendations by August 22, 2004, that his rebuttals would be forward to the Department of the Army.

35. On August 20, 2004, Mr. Aguayo again attempted to submit to Captain Grissom his rebuttals to the recommendations of Major General Batiste (addressing the reasons given by Lieutenant Risch in his recommendation to Major General Batiste), Lieutenant Colonel Sinclair, and Colonel Dragon. Captain Grissom refused to accept the rebuttals, telling Mr. Aguayo that the Chain of Command was not required to accept them.

36. On September 1, 2004, Mr. Aguayo was informed of the Army's denial of his application for discharge as a conscientious objector.

37. There is no appeal within Army administrative channels from the decision of the Secretary. Petitioner has exhausted his administrative remedies.

38. The Secretary's denial of Mr. Aguayo's conscientious objector application is not supported by any specific justification qualifying as a "reason" and lacks any legally sufficient basis in fact.

39. If Mr. Aguayo is required to continue to serve in the United States Army, he will have to choose between participating in the military and following the deeply-held beliefs which

guide his life, and may be subjected to trial by court-martial and to punishment for adhering to his sincere and legally-protected scruples.

## CLAIMS FOR RELIEF

40. Because the petitioner made out a prima facie claim for discharge as a conscientious objector, and because the decision of the respondent Secretary of the Army to deny that claim is unsupported by any reason, as required by AR 600-43, ¶ 2-8.d(3), and because it lacks any basis in fact, the petitioner is entitled to an order directing the respondents to release him from their custody and to discharge him honorably as a conscientious objector.

41. Should this Court conclude that the respondent's denial of Mr. Aguayo's application for discharge provides a sufficient reason and that that reason is supported by a basis in fact, the Court should nevertheless grant the writ on a conditional basis, because the Army violated the governing Department of Defense regulation as well as its own regulation when it failed and refused to provide Mr. Aguayo with the opportunity to rebut negative recommendations. The Court should grant the writ and order the petitioner's release unless within the time set by the Court, the Army withdraws its denial of Mr. Aguayo's application, permits him to submit rebuttals to negative recommendations, considers those rebuttals, and issues a new decision on Mr. Aguayo's application for discharge which either grants the application or denies it for a specific lawful reason which has a genuine factual basis in the administrative record.

42. The petitioner is entitled to an award of reasonable attorney fees under the Equal Access to Justice Act and other applicable law, because:

   a. the decision of the respondent Secretary of the Army denying the petitioner's application for discharge as a conscientious objector is not substantially justified; and

   b. the net worth of the petitioner does not exceed $2 million.

**WHEREFORE,** Petitioner prays that this Court:

A. Issue an Order directing the Respondent to show cause before this Court within 20 days why a Writ of Habeas Corpus should not be issued;

B. Grant a temporary restraining order and preliminary injunction ordering the respondent to assign the petitioner during the pendency of this case to duty which least conflicts with his stated beliefs and to retain him at his currently-assigned base within the Federal Republic of Germany;

C. After full consideration on the merits, issue the writ of habeas corpus, and order Petitioner's release from the Respondent's custody in the United States Army with an honorable discharge as a conscientious objector;

D. Issue the writ of habeas corpus even if it concludes that the Army gave a sufficient reason to support its denial and that that reason is supported by a basis in fact, and order the petitioner's release unless within the time set by the Court, the Army withdraws its denial of Mr. Aguayo's application, permits him to submit rebuttals to negative recommendations, considers those rebuttals, and issues a new and valid decision on Mr. Aguayo's application for discharge;

E. Grant him costs and reasonable attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d), or other applicable law; and

F. Grant such other relief as law and justice require.

> Respectfully submitted,
> THE PETITIONER

Dated: August 5, 2005

LOCAL COUNSEL:

*[signature]*

JAMES R. KLIMASKI

By: JAMES H. FELDMAN, JR. (PA Bar # 36345)
LAW OFFICE OF PETER GOLDBERGER
50 Rittenhouse Place
Ardmore, PA 19003
610-649-8200
610-649-8362 (Fax)

(DC Bar No. 243543)  
KLIMASKI & ASSOCIATES, P.C.  
1819 L Street, NW  
Suite 700  
Washington, D.C. 20036-3830  
202-296-5600  

Email: AELaw2@aol.com

Attorneys for the Petitioner

## VERIFICATION

Pursuant to 28 U.S.C. §§ 1746 and 2242, Agustín Aguayo declares, under penalty of perjury under the laws of the United States of America, that:

1. I have read the foregoing Petition for Writ of Habeas Corpus.

2. I know that the factual allegations contained in the petition are true.

3. With respect to facts alleged in the petition upon information and belief, I believe these factual allegations to be true.

4. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Agustín Aguayo

Dated: _____, 2005,
At: Schweinfurt, Germany

14