UNITED STATES DISTRICT COURT
DISTRICT OF THE DISTRICT OF COLUMBIA

AGUSTÍN AGUAYO,                          :

               Petitioner,          :

     v.                          :          No. 05-1580 (EGS)

DR. FRANCIS J. HARVEY,                    :
Secretary of the Army,
                                         :
          Respondent.


PETITIONER'S TRAVERSE TO RESPONDENT'S OPPOSITION
TO PETITION FOR A WRIT OF HABEAS CORPUS


Agustín Aguayo has petitioned this Court for a writ of habeas corpus

under 28 U.S.C. § 2241(c)(3), requiring the Army to discharge him as a

conscientious objector.  On April 19, 2006, the respondent ("Army") filed its

opposition, along with copies of the administrative record ("AR") and U.S. Army

Regulation ("AReg") 600-43 (the Army regulation governing the processing of

applications for discharge as a conscientious objector).  On April 21, 2006, the

respondent filed Exhibit B to its response, a letter from the president of the

Army's Conscientious Objector Review Board (DACORB), which it had

"inadvertently failed to include" with its opposition.  Errata filed with Exhibit B

on April 21, 2006.  Pursuant to the Court's April 10 Order, this traverse is

timely filed on or before Monday, May 8, 2006.[1]

---

[1] Although the Court's order provides that the petitioner's "opposition is due no later that May 6, 2006," because May 6 is a Saturday, the petitioner's "opposition" (more properly described as a "traverse," *see* 28 U.S.C. § 2242) is due the following Monday.  Fed.R.Civ.P. 6(a).

Although conscientious objectors in the military have no constitutional right to be discharged on that basis, see *Gillette v. United States,* 401 U.S. 437, 441 (1971), Department of Defense and Army regulations in "recogni[tion of] the historic respect in this Nation for valid conscientious objection to military service," *Parisi v. Davidson,* 405 U.S. 34, 45 (1972), together provide for the discharge of members who develop conscientious objector beliefs after entering military service.  The Defense Department has explained that it provides for the discharge of conscientious objectors, because "the Congress … has deemed it more essential to respect a man's religious beliefs than to force him to serve in the armed forces."  Department of Defense Directive No. 1300.6 (May 10, 1968).[2]  See *Parisi v. Davidson,* 405 U.S. at 45 (quoting from this regulation); *see also* 42 U.S.C. § 2000bb (Religious Freedom Restoration Act, expressing same Congressional judgment).  Although Courts are always hesitant to interfere in military matters, for more than thirty years it has been "settled that [a member of the armed forces] may seek habeas corpus relief in a federal district court on the ground that the denial of his [conscientious objector discharge] application had no basis in fact."  *Parisi v. Davidson,* 405 U.S. at 35.  Mr. Aguayo is entitled to habeas relief because there is no lawful basis in fact in the record to support the Army's denial of his application for discharge as a conscientious objector.

---

[2] The current version of DoD Dir. 1300.6 may be found at 32 C.F.R., part 75.

<u>Procedural History and Statement of Facts</u>

Agustín Aguayo was not a conscientious objector in November 2002, when he enlisted in the Army as a "Healthcare Specialist" through the Delayed Entry Program.  AR 0004, 0007 (¶ 25.b.), 0013, 0082, 0099.  At that time, he was experiencing financial difficulties and was looking for a way to supplement his income and broaden his academic options.  AR 0096-97.  Although Mr. Aguayo has "always had strong feelings about war[,] ... it wasn't till [he] joined the army that those 'feelings' changed into full fledged objections."  AR 0099.

Shortly after he joined the military, Mr. Aguayo began to have doubts about whether he could resolve his moral qualms in a way that would allow him to remain in the Army – as he had hoped and expected he could do when he enlisted.  AR 0097-99.  He initially brushed aside those doubts as normal feelings of homesickness.  AR 0097.  Although he was "very nervous handling the rifle" during basic training, and "began to feel that it was wrong for him," he "didn't say anything at the time because he was hoping that the feeling would go away.  He ... wanted to 'be a man' and complete what he had begun."  AR 0083.  But as his military training progressed, the feelings did not go away; they became stronger.  AR 0097.  When he trained with live ammunition in preparation for deployment to Iraq, "shooting at life-like silhouettes brought it home to him that he might really have to kill someone and that he didn't believe that he could do that."  AR 0083.  He began to think about the things his father (who is a Jehovah's Witness and a pacifist) had taught him, and

realized that he was unable to stab or shoot anyone.  *Id.*  He put it this way in

his application for discharge as a conscientious objector:

> Shortly after being inducted into basic training and espe-
> cially after being introduced to arms I realized what the
> Army was truly about.  My morals shouted to the very core
> of my conscience and soul that this was wrong.  Progres-
> sively it has become overwhelming.  I can NO LONGER
> deny myself.  To remain loyal to my convictions, I cannot be
> part of the army (sic) whether as an active participant or a
> (sic) unwilling bystander.  I have always had strong feelings
> about war.  I didn't like the idea of people killing each
> other.  However, it wasn't till I joined the army that those
> "feelings" changed into full fledged objections.  I realized
> that I could not hurt, injure, or kill anyone under any
> circumstances.  I realized that I could not participate in any
> war and that I could not be a part of this entity based on
> my objections and morals.

AR 0098-99.  Agustín Aguayo's deeply-held moral beliefs eventually developed

to the point that they prevented him from remaining in the Army, because they

prohibit him from participating in war in any form, either as a combatant or as

a non-combatant.  Mr. Aguayo explained his beliefs in his application for

conscientious objector discharge in the following way:

> My moral view does not allow me to take the life of another
> human being.  Human life and preserving it is of utmost
> importance to me.  I could not possibly contemplate the
> notion of causing personal harm to others or assisting
> others in doing so.  This also includes participating in any
> organized movement in a combat zone.  I believe that
> violence of any kind, or supporting thereof, for example
> being a combat medic (assisting the injured to later go back
> to a combat area) is not acceptable.  My conscience will not
> allow me to continue down this path.  I believe that
> everyone has some value and I do not believe it is my place
> to take anyone's life.  I cannot walk into any situation and
> assume responsibility of judge, juror and executioner.  I
> have come to realize that it is not my place to hurt someone
> or end their life under any circumstance.  I believe that
> there are higher forces which handle these situations.

AR 0095.  Once he realized that he could not serve in the Army, Mr. Aguayo did

not immediately apply for discharge as a conscientious objector because he

was not aware of that option.  AR 0099, 0119.  Once he learned about the

Army's conscientious objector regulation, he prepared his application for

discharge and submitted it several days later, on February 8, 2004.  AR 0062-

63

Once he submitted his application for discharge, the Army investigated

his claim as provided in Army Regulation 600-43.  As required by AReg 600-43

¶ 2-1.*e*, Mr. Aguayo was interviewed by a chaplain and a psychologist.  The

chaplain reported that Mr. Aguayo's mother was Roman Catholic and that his

father was a Jehovah's Witness, but that Mr. Aguayo's own personal beliefs did

not grow out of his identification with any organized religion.  AR 0073 ¶ 2.

The chaplain also reported that while Mr. Aguayo "expressed concern about his

ability to be able to take a life in combat" when he was considering enlisting, he

enlisted "as a medic, thinking it would lessen his conflict," and that "he would

be able to work through his conflict with taking a life in combat."  *Id.* ¶ 1.  The

chaplain concluded that Mr. "Aguayo seems to be sincere in his beliefs

although the timing of his request makes it questionable."  *Id.* ¶ 5.  The psych-

ologist found that Mr. Aguayo "does not have a mental health condition which

would warrant discharge through medical channels."  AR 0075.

Pursuant to AReg 600-43 ¶ 2-4.*a.,* the Army appointed Captain Sean D.

Foster to investigate Mr. Aguayo's application.  AR 0060-61.  On March 14,

2004, Captain Foster conducted a hearing on Mr. Aguayo's application for

discharge, as required by AReg 600-43, ¶ 2-5.*a.*  AR 0082-85.  At that hearing,

which was conducted at Vanguard Base in Tikrit, Iraq, Captain Foster inter-

viewed Mr. Aguayo as well as four witnesses, Specialist Lopez, Private First

Class Benson, Staff Sergeant Campbell, and Sergeant First Class Gentry.  *Id.*

Each of these witnesses testified that he believed Mr. Aguayo to sincerely hold

his stated beliefs.  *Id.*  Captain Foster noted in his summary of the testimony

that Mr. Aguayo became "visibly disturbed to be talking about [the prospect of

having to kill someone] and seemed close to tears."  AR  0083.

On March 20, 2004, Captain Foster submitted a written report to the

Army.  In that report, Captain Foster made the following findings:

> 1 – That PFC Aguayo seems to have a legitimate moral
> dilemma concerning his role in the military.
>
>     A – After reviewing all of the evidence presented, along
> with all the testimonies made during PFC Aguayo's hearing,
> it seemed clear to me that PFC Aguayo is absolutely sincere
> in his stated beliefs that he is opposed to "war in any form".
> In the testimony given by both PFC Aguayo and his platoon
> sergeant, SFC Gentry, it became clear to me that PFC
> Aguayo's role as a "Healthcare Provider" was probably not
> well-defined by his recruiter and that PFC Aguayo was led
> to believe he would be performing duties in a healthcare
> facility such as a hospital.  After finding out what his actual
> job would be as a medic, PFC Aguayo began to have doubts
> in his mind as to whether he could truly perform those
> duties.  Despite these doubts, he continued to try to do his
> job the best that he could because, in his own words, he
> did not want to disappoint his family or his fellow soldiers.
> His objection was one that grew over time beginning in
> basic training and solidifying during the Convoy Livefire
> Exercises during gunnery October 2003.  His objection is
> not based on religious reasons, but rather an internal
> moral dilemma that, to me, became very evident during the
> hearing.  (The soldier was on the verge of tears through a
> great deal of the hearing.)  Testimony during the hearing,
> interview with Chaplain Douglas Downs, information

> submitted in accordance with Annex B, AR 600-43, and
> letters from individuals that know PFC Aguayo support PFC
> Aguayo's stated beliefs that he has such an internal conflict
> that he cannot continue on with his current duties effec-
> tively.

AR 0053. Captain Foster concluded his report by recommending that the Army discharge Mr. Aguayo as a conscientious objector. AR 0054. Because Captain Foster had recommended approval of his application for discharge, Mr. Aguayo submitted no rebuttal, as would have been his right under AReg 600-43 ¶ 2-5.*m.* AR 0112.

After the officer appointed by the Army to investigate his application for discharge as a conscientious objector had recommended approval of that application, Mr. Aguayo's file was forwarded through the chain of command as required by AReg 600-43 ¶ 2-6. Several officers in Mr. Aguayo's command eventually recommended that his application for discharge as a conscientious objector be denied. None of these officers ever personally interviewed Mr. Aguayo concerning his beliefs. AR 0112. Other than Lieutenant Colonel Sinclair, none of them even met Mr. Aguayo. *Id.* Every officer who actually interviewed Mr. Aguayo concerning his conscientious objector beliefs found him to be sincere.

On April 29, 2004, Lieutenant Colonel Jeffrey A. Sinclair, the commanding officer of the 18th Infantry Regiment of the 1st Battalion of the 2d Brigade of the Army's 1st Infantry Division, submitted a written memorandum recommending disapproval of Mr. Aguayo's application for discharge. AR 0057. Although Lieutenant Colonel Sinclair conceded that Mr. Aguayo" is not well-

suited for the profession of arms," he nevertheless recommended disapproval, because in his opinion Mr. Aguayo's "pursuit of conscientious objector status is an attempt to remedy his anxiety all soldiers face during an extended deployment in a combat theater of operations." *Id.* Lt. Col. Sinclair never interviewed Mr. Aguayo concerning his beliefs; he offered no basis for his comments.

On May 9, 2004, Colonel Randal A. Dragon submitted a recommendation that Mr. Aguayo's application be disapproved. AR 0055. The rationale Colonel Dragon provided was as follows: "Concur w/Bn Cdr. Do not believe that soldier's belief is consistent w/ conscientious objection." *Id.* Colonel Dragon did not identify the inconsistency to which he alluded, nor was any such alleged inconsistency the basis for Lt. Col. Sinclair's adverse recommendation.

On May 23, 2004, Major General John R. S. Batiste, the commanding officer of the Army's 1st Infantry Division, recommended disapproval of Mr. Aguayo's application. AR 0046. Although Major General Batiste did not provide any reasons for his recommendation, attached to his recommendation was a memorandum from Lieutenant Colonel Stuart W. Risch, Staff Judge Advocate, which recommended disapproval for two reasons. First, Lt. Col. Risch did not believe Mr. Aguayo was sincere, because "[h]e has not persuasively shown how his duties as a medic are incompatible with his newly discovered beliefs," because he submitted his application days before his unit deployed to Iraq, and because a friend of his had also applied for discharge as a conscientious objector. The second "reason" offered by Lt. Col. Risch comprised four different reasons: (1) Mr. Aguayo did not "identify any specific

ways he has altered his behavior to accommodate his beliefs," (2) he did not identify a source for his beliefs, (3) he performed well as a medic, and (4) he wanted "to get out of the deployment and the Army." AR 0047.

Although Mr. Aguayo attempted to submit rebuttals to these negative recommendations, none of his rebuttals was ever submitted to the DACORB. AR 112. On July 30, 2004, the Army officially denied Mr. Aguayo's application for discharge as a conscientious objector. AR 0044. The Army's denial letter reads in full:

> 1. The DA [Department of the Army] Conscientious Objector Review Board (DACORB) has reviewed the application of PFC Agustin Aguayo for Conscientious Objector Status (CORB).
>
> 2. After thorough examination of the Case Record, the DACORB determined that the applicant did not present convincing evidence, IAW 600-43, that the applicant's stated beliefs warrant award of 1-O status.
>
> 3. A copy of the case record will be included in the OMPF, CMIF, and MPRJ IAW AR 640-10.
>
> BY ORDER OF THE SECRETARY OF THE ARMY

*Id.* It was signed by Colonel Donald W. Browne, Jr., President of the Army's Conscientious Objector Review Board. *Id.*

On August 5, 2005, Agustín Aguayo petitioned this Court under 28 U.S.C. § 2241 for a Writ of Habeas Corpus.[3]  Following the Court's August 15,

---

[3] The petition alleged that jurisdiction lies in this Court based on the petitioner's assignment in Germany and the presence of the Secretary of the Army, his ultimate custodian, within the territorial jurisdiction of this Court. Relying on *Burns v. Wilson*, 346 U.S. 137 (1953) (court-martial convicts detained in Guam named Secretary of Defense as respondent), and *United States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955) (court-martial convict detained in Korea named Secretary of the Air Force as respondent), a judge of this Court recently held that it had jurisdiction to hear habeas corpus petitions filed by detainees being held in Guantanamo Bay,

continued ...

2005, issuance of an Order to Show Cause, the parties filed a joint motion to stay the proceedings, because the Army had withdrawn its decision denying Mr. Aguayo's application for discharge and had agreed to consider Mr. Aguayo's rebuttal for a *de novo* review.  On September 19, 2005, Mr. Aguayo submitted his rebuttal to the Army.  AR 0112-121.

In November 2005, the DACORB again "convened to consider [Mr. Aguayo's] request for discharge 1-O classification." AR 0087.   One member of the DACORB -- the DACORB's representative from the office of the Staff Judge Advocate -- voted to approve Mr. Aguayo's application for discharge.  AR 0088. The other two members (the Chaplain member of the DACORB and the DACORB President) voted to disapprove the application, however.  *Id.*  On January 30, 2006, on the basis of this split vote, the Army once more officially denied Mr. Aguayo's application for discharge as a conscientious objector.  AR 0089.  The Army's denial letter reads in full:

1. The DA [Department of the Army] Conscientious Objector Review Board (DACORB) has reviewed the application of PFC Agustin Aguayo for Conscientious Objector Status (CORB).

2. After thorough examination of the Case Record, the DACORB determined that the applicant did not present clear and convincing evidence, IAW 600-43, that the applicant's stated beliefs warrant award of 1-O status.

---

(... continued)

Cuba.  See *Gherebi v. Bush*, 338 F.Supp.2d 91 (D.D.C. 2004) (Green, J.).  See also *Rumsfeld v. Padilla*, 542 U.S. 426, 436 n.9 (2004) (citing *Toth* and *Burns* for principle that the Court has "long implicitly recognized an exception to the immediate custodian rule in the military context where an American citizen is detained outside the territorial jurisdiction of any district court"). *Cf. Eisel v. Secretary of the Army,* 477 F.2d 1251 (D.C. Cir. 1973) (in inactive reservist case, habeas jurisdiction lies in the reservist's domicile).  Since the respondent has not challenged this Court's subject matter or territorial jurisdiction, no further reply is called for.

3. A copy of the case record will be included in the OMPF,
   CMIF, and MPRJ IAW AR 640.10.

BY ORDER OF THE SECRETARY OF THE ARMY

AR 0089.[4]  The denial was signed on behalf of the Board by its President, Col.

James H. Gant, Jr.  *Id.*  The decision of the DACORB is the final decision of the

respondent Secretary of the Army.  AReg 600-43 ¶2-8.*a.*

On March 13, 2006, Mr. Aguayo filed an amended petition for writ of

habeas corpus.  Eleven days later, on March 24, 2006 (nearly two months after

the final decision was rendered), Colonel Gant submitted to Mr. Aguayo's

commanding officer a memorandum which he claims  was "not an exhaustive

or all-inclusive list of reasons for the denial of the application."  Ex. B to Army

opp.  The memorandum asserts that the DACORB denied Mr. Aguayo's appli-

cation, at least in part, for the following reasons:

- Applicant lacks the religious foundation; the underpinning that
  supports Conscientious Objector beliefs

- Applicant has not provided any significant source of his beliefs;
  conscience or moral views that would warrant Conscientious
  Objector status

- Appears that applicant held beliefs prior to entry to the Army.
  Although these could have crystallized after entry, it still
  appears that these beliefs were considerable prior to entry with
  no significant identification of these beliefs at entry to the Army

- Questionable timing of application just prior to unit deploy-
  ment

Ex. B to Army opp.  This memorandum was never made a part of the adminis-

trative record.

---

[4]  This decision differs from the Board's prior order only in its insertion of the words "clear and" before the word
"convincing."  This change simply conformed the order better to the boilerplate of the standard, without clarifying it
or responding to the evidence in the record to any greater extent than before.

There is no appeal within the Department of the Army administrative channels from the decision of the Secretary of the Army. The petitioner has therefore exhausted his administrative remedies. See *Parisi v. Davidson,* 405 U.S. at 38 n.3 (Army's denial of CO discharge satisfies exhaustion requirement).

<u>ARGUMENT IN REPLY</u>

Agustín Aguayo is entitled to be discharged as a conscientious objector, because he has satisfied each of the requirements set out in Department of Defense regulations. *See* 32 C.F.R. Part 75. Under these regulations, the military must discharge any member:

> (1) Who is conscientiously opposed to participation in war in any form;

> (2) Whose opposition is founded on religious training and belief; and

> (3) Whose position is sincere and deeply held.

32 CFR § 75.5(a). In addition, "no member of the Armed Forces who possessed conscientious objector beliefs before entering military service is eligible for classification as a conscientious objector" if such pre-existing beliefs would have qualified him for a CO exemption under the draft laws. 32 CFR § 75.4(a)(1). There is no other requirement, and none may be created by the DACORB or by this Court. To implement this regulation, the Army has adopted AReg 600-43.

When a military service branch denies an application for discharge for reasons of conscientious objection, federal courts will grant relief pursuant to their habeas corpus jurisdiction under 28 U.S.C. § 2241, provided that the

petitioner has asserted beliefs which, if sincerely and deeply held, would qualify him for discharge as a conscientious objector, and the military has demonstrated no basis in fact in the record to support its denial of the claim. *United States ex rel. Barr v. Resor,* 443 F.2d 707, 708 (D.C. Cir. 1971).

In this case, the record clearly establishes that Agustín Aguayo asserted qualifying beliefs. First, Mr. Aguayo has stated that he is opposed to his part-icipation in war in any form. *See* AR 0099 (moral beliefs prevent him partici-pating "in any war"). Second, his opposition is grounded in "religious training and belief," as that term is defined by DoD and Army regulation.[5]

In its memorandum in opposition, the Army argues that Mr. Aguayo's petition must be denied, because in the view of respondent's attorneys, "the

---

[5] Army regulation defines "religious training and belief to include a:

> deeply held moral or ethical belief, to which all else is subordinate or upon which all else is ultimately dependent, and which has the power or force to affect moral well–being. … [I]n the case of deeply held moral or ethical beliefs, [the belief may be] a belief held with the strength and devotion of traditional religious conviction. The term "religious training and belief" may include solely moral or ethical beliefs even though the applicant himself may not characterize these beliefs as "religious" in the traditional sense, or may expressly characterize them as not religious. The term "religious training and belief" does not include a belief that rests solely upon consideration of policy, pragmatism, expediency, or political views. (In attempting to determine whether a conscientious objection to participation in war or combat is founded upon religious training and belief, as defined above, the proper scope of inquiry is whether the person holds the asserted beliefs and whether they are the product of a conscious thought process resulting in such a conviction as to allow the person no choice but to act in accordance with them. Beliefs can be deeply held even though they lack sophistication. Care must be taken to avoid the inference that an applicant who lacks sufficient insight or knowledge to express his or her beliefs clearly does not hold the beliefs, or that they are not "religious" in origin or held with the strength of traditional religious convictions).

AR 600-43, Glossary Section II. *Cf. Welsh v. United States,* 398 U.S. 333 (1970) (broadly construing "religious training and belief" under draft law so as to include non-traditional expressions of religious belief, including non-deist religions and moral and ethical beliefs which take the place of religion in a person's life even where applicant does not describe own belief as "religious"); *Daoust v. Laird,* 434 F.2d 520 (D.C. Cir. 1970) ("remanding" to Army to reconsider CO application in light of *Welsh*).

record includes numerous facts that support the denial by the DACORB."

Army opp. 8.  The Army's attorneys then proceed to pick through the record for

any evidence they believe might support the DACORB's denial of Mr. Aguayo's

application, without any concern as to whether the evidence they cite supports

the actual reason or reasons on which the respondent based his denial of Mr.

Aguayo's application.  *Id.* 9-12.  The arguments of respondent's counsel are

focused on the wrong issue.  Because the Army violated its own controlling

regulation when it failed to include in the record its reason or reasons for

denying Mr. Aguayo's application, this Court should disregard the respondent's

counsel's current arguments based upon *post hoc* rationales not grounded in

the decision actually rendered.   The Court should then grant the petition and

issue the writ of habeas corpus directing the respondent to discharge Mr.

Aguayo from the Army forthwith.

A.    The Record Does Not Contain the Army's Reasons
      for Denying Mr. Aguayo's Application.

        Contrary to the Army's own regulation,[6] the reasons the Army denied Mr.

Aguayo's application for discharge have not been made part of the record in

this case.  Nor can those reasons be determined with reasonable certainty

through an examination of the record.  While the respondent has attached to

its opposition a belated letter from the President of the DACORB which

purports to include a partial list of the Army's reasons, because its timing is

---

[6] "If a determination by HQDA that the person's request is disapproved, the reasons for this decision will be made a part of the record.  It will be provided to the person through command channels." AReg 600-43 ¶ 2-8.*d.*(3).

highly suspicious (having been produced eleven days *after* the filing of the amended petition), because that letter is not in the form of an affidavit, and because it does not even claim to include all the Army's reasons, this Court should disregard that document.  Instead, after a hearing at which counsel may address any questions from the Court, the Court should grant the relief requested.

The closest the record comes to providing the Army's reasons for denying Mr. Aguayo's application are the minutes of the DACORB and the DACORB's formal denial letter.  AR 0087-89.  While these minutes include handwritten notes by the two board members who voted to deny Mr. Aguayo's application,[7] these notes provide no clue as to why the DACORB, as a body, denied the application.  The Chaplain's notes are little more than legalistic gibberish:

> SPC Aguayo does not demonstrate a clear, convincing evidence of a fixed, firm, and crystallized burden of proof.  Applicant has not established, by clear and convincing evidence, that the nature of the claim comes within the definition of criteria IAW AR 600-43.

AR 0088 (sic).  The first sentence is meaningless – other than to suggest that the Chaplain did not understand the CO regulation.  The second sentence appears to have been written either at a different time or by a different person.  Not only is the handwriting clearly different, but it appears to try to interpret the previous sentence.  The second sentence is almost a verbatim quote from AReg 600-43, which provides that:

---

[7] The third Board member, the representative of the Staff Judge Advocate Office, voted to approve the application.  AR 0088.

> applicants must establish, by clear and convincing evidence, that the nature or basis of the claim comes within the definition of criteria prescribed in this regulation for conscientious objection and that their beliefs are sincere.

AReg 600-43 ¶ 1-7.*c.* The "notes" submitted by the DACORB President state that "APPLICANT HAS NOT DEMONSTRATED CLEAR AND CONVINCING EVIDENCE OF A FIRM FIXED BELIEF." AR 0088 (capitalization original). At most, these notes show that the two members who voted for disapproval did not believe that Mr. Aguayo had met his burden of proof. Neither member pointed to any basis for such a conclusion, much less did the Board as a body endorse any rationale.

The DACORB's formal denial letter, dated January 30, 2006, provided essentially the same "reason" – *i.e.,* that Mr. Aguayo had failed to meet his burden of proof. AR 0089. Contrary to the Army's unsupported argument, Army opp. 11, that kind of "reason" does not comply with the requirement of AReg 600-43 ¶ 2-8.*d.*(3) that the "reasons" for the decision "be made part of the record." While the D.C. Circuit has not fully considered the meaning of the regulation's "reasons" requirement, those circuits that have, have concluded that the kind of meaningless boilerplate the Army employed in this case does not comply.

The Second Circuit has held that the "reasons" provision is "is a meaningful requirement, and one that cannot meaningfully be satisfied by a bare recitation by the CORB of the ultimate statutory criteria ...." *United States ex rel. Checkman v. Laird,* 469 F.2d 773, 787 (2d Cir. 1972). The Ninth Circuit has held that the "reasons" provision requires the military's deciding authority

to state more than legal conclusions – the reasons given must "clearly illuminate[] the factual basis" of the decision. *Sanger v. Seamans,* 507 F.2d 814, 818 (9th Cir. 1974); see also *United States ex rel. Coates v. Laird,* 494 F.2d 709, 711 (4th Cir. 1974) (military must "articulate its reasons for its decision and … articulate them clearly").  The Army has not complied with the reasons requirement in this case.

    A clear understanding of the Army's actual reasons for denying Mr. Aguayo's application is essential, because this Court's task is to determine whether *those* reasons are supported by a "basis in fact."  Every D.C. Circuit case on the burden of proof in military habeas petitions challenging the decision of a military service to deny a CO application implicitly follows this rule. See *United States ex rel. Barr v. Resor,* 443 F.2d 707 (D.C. Cir. 1971), *Bortree v. Resor,* 445 F.2d 776 (D.C. Cir. 1971), and *United States ex rel. Sheldon v.O'Malley,* 420 F.2d 1344 (D.C. Cir. 1969).  In each of these cases the Court of Appeals did not search the record for evidence that *could* have supported the Army's denials in those cases.  Instead, it limited its review to the *specific* reasons given by the Army for denying conscientious objector status.  443 F.2d at 709; 445 F.2d at 778 and 783; 420 F.2d at 1349-50.  Other Circuits have also followed that procedure.  See *Checkman,* 469 F.2d at 783 ("The proper focus of a reviewing court is on the reasons given by the CORB and not on reasons that may come to light if and when a court rummages throughout the record in an effort to reconstruct on what basis the board might have decided the matter"); *Sanger,* 507 F.2d at 817 ("the reviewing court must know the

reasons for the adverse decision in order adequately to review the Secretary's decision within the narrow scope permitted"); *Peckat v. Lutz*, 451 F.2d 366, 370 (4th Cir. 1971) (reason for denial "must be made manifest in the decision itself. It will not do to leave the point in a state of ambiguity until some future day when government lawyers may devise an explanatory dissertation for inclusion in a defensive brief").

The Ninth Circuit has held that the military complies with the "reasons" requirement if the "reasons can be determined from the agency record with reasonable certainty." *Sanger*, 507 F.2d at 818 (internal quotation omitted). Even that more generous standard cannot be met in this case. There are several reasons for this. First, the DACORB obviously did not rely on the findings and recommendation of the officer appointed to investigate Mr. Aguayo's claim, since that officer recommended that the application be granted. AR 0054. It also clearly did not rely on the report of the only other officer to have actually talked with Mr. Aguayo about his application – the chaplain, because the chaplain also concluded that he was sincere. AR 0073. While other officers recommended disapproval, it is unclear from the record whether the DACORB relied on any of these observations. Of the four officers who recommended disapproval, only two (Lt. Col. Sinclair and Lt. Col. Risch) gave any reasons at all. Lt. Col. Sinclair opined that Mr. Aguayo was merely "attempt[ing] to remedy his anxiety all soldiers face during an extended deployment in a combat theater of operations," AR 0057, while LTC Risch relied on entirely different reasons. AR 0057. Neither of these officers had inter-

viewed Mr. Aguayo and neither pointed to any evidence to support their speculative impressions. As the record shows, the DACORB itself gave no clue as to which reasons, if any, it credited, much less why.

While the reasons on which the DACORB relied are unclear from the *record*, the Army has submitted a *post hoc* letter from the President of the DACORB which purports to provide a partial list of the reasons on which the DACORB relied. Ex. B, Army opp. In general, a court's consideration of a conscientious objector habeas petition is limited to the military's administrative record. See *Silberberg v. Willis*, 420 F.2d 662, 665 (1st Cir. 1970) (CO habeas case must be decided solely on evidence before the military agency – additional evidence not permitted); *Armstrong v. Laird*, 456 F.2d 521, 522 (1st Cir.1972) (same); *Keefer v. United States*, 313 F.2d 773, 776 (9th Cir.1963) (same); *Zelman v. Carpenter*, 457 F.2d 621, 622 (2d Cir. 1972) (same); *Helwick v. Laird*, 438 F.2d 959, 965 (5th Cir. 1971) (same). At most, the Supreme Court has held, in cases which must be decided on an administrative record, where the administrative agency has failed to explain the reasons for its decision, a court may receive affidavits or hold an evidentiary hearing to determine the reasons relied on by the agency. *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973).

In this case, the letter proffered by the respondent is not in the form of an affidavit; does not purport to list all of the Army's reasons, and does not explain in adequate detail the Army's reasons. Moreover, as noted, its timing is highly suspicious. This Court may therefore not rely on it to decide this case. Having been afforded two opportunities to decide Mr. Aguayo's discharge appli-

cation in accordance with law – the second opportunity after having the benefit of petitioner's counsel's objections, as found in the original habeas petition – the Court should simply reject the DACORB order and grant the petition.[8]

B.     The Record Provides No Basis in Fact to Deny Petitioner's Application, Regardless of the Respondent's Reasons for Disapproving It.

Should this Court deny the petitioner's request for a hearing to confirm the failure of the Army to give reasons for denying petitioner's application for discharge, it should not "remand" the case to give the Army an additional opportunity to explain its reasons.  The Court may grant the writ, if after examining the record, it can find no basis in fact to deny Mr. Aguayo's application, regardless of the respondent's reasons for denying it.  *Checkman,* 494 F.2d at 712.  In other words, if there is no substantial basis on which the Army could legitimately have denied Mr. Aguayo's application, the writ must be granted.  Should the Court determine that there may be facts which would have supported a denial, it should not discuss its reasoning.  Otherwise, it would simply be giving the Army a roadmap to deny Mr. Aguayo's application even if the real reasons it denied his application are not supported by a basis in fact.  Were this Court to determine that the record may support a reason to deny Mr. Aguayo's application, the best approach would be to hold an eviden-

---

[8] While provisionally granting the writ so as to give the DACORB an opportunity to supplement the record with its reasons is the approach courts have generally taken where the military has failed to provide adequate reasons for its decision, see, *e.g., Checkman,* 469 F.2d at 788, that approach is not preferable in this case.  Any second "remand" would likely consume many months more and thus force Mr. Aguayo to compromise his most deeply-held beliefs, causing him additional unnecessary and irreparable harm.  *See* 28 U.S.C. § 2243 (court shall dispose of case "as law and justice require").  At the very most, the Court could hold an evidentiary hearing under *Camp v. Pitts* to determine for itself the real reason or reasons the DACORB denied Mr. Aguayo's application for discharge.

tiary hearing at which the members of the DACORB could be questioned.  This approach is the one most likely to reveal the Army's real reasons for denying Mr. Aguayo's application.

In any event, counsel for the Army have taken the approach of exploring every possible shred of evidence in the record on which a basis in fact might be premised for any reason that might be fathomed.  This approach is not sufficient to support a denial of the writ.  At worst, it might require the Court to remand the case or hold an evidentiary hearing.  *See* note 8 *ante.*  Because none of the reasons advanced by counsel is supported by a basis in fact in the record, the writ must be granted for this reason alone.

Counsel for the Army advances numerous "reasons" for denying Mr. Aguayo's application.  None of them stands up to scrutiny.  Mr. Aguayo's beliefs, as he has articulated them, fulfill the Army's definition of a conscientious objector.  Moreover, there is no factual basis to conclude that his profession of beliefs is not sincere.  Hence, he is entitled to discharge.

The first reason advanced by the Army's lawyers is that "Petitioner's application does not identify any religious training or belief that would justify conscientious objector status.  *See* AR 0095-106."  Army opp. 9.  The respondent's citation to the record does not support its conclusion.  Instead, it demonstrates that Mr. Aguayo did identify such "religious training or belief." As Mr. Aguayo explained in his CO application, he has a "moral view [that] does not allow [him] to take the life of another human being."  AR 0095.  His "moral view" is that "Human life and preserving it is of utmost importance," *id.,* that

every human being has "some value," *Id.,* and that whether someone's life should end is the exclusive province of "higher forces," *id.,* which, as an agnostic, Mr. Aguayo does not fully comprehend. *Id.* These beliefs prevent him from participating in war in any form. *Id. See also* AR 0115 ("my deeply-held moral and ethical beliefs prevent me from participating in war in any form"). Moreover, Mr. Aguayo identified childhood religious training and belief of a more traditional form, from his father, who is a Jehovah's Witness and a pacifist. Mr. Aguayo explained that soon after he began basic training, his "morals shouted to the very core of [his] conscience and soul that this was wrong. Progressively it has become overwhelming. I can NO LONGER deny myself." AR 0098-99 (capitalization original).

Mr. Aguayo's stated beliefs fit within the Army's definition of "religious training and belief," because they derive their moral authority from "an external power … to which all else is subordinate or upon which all else is ultimately dependent, and which has the power or force to affect moral well–being," AReg 600-43, Glossary, Section II (Terms), and because "they are the product of a conscious thought process resulting in such a conviction as to allow the person no choice but to act in accordance with them." *Id.* The first reason suggested by respondent's counsel is thus not supported by a basis in fact.

The second reason advanced by the Army's lawyers is that Mr. Aguayo's "beliefs do not appear to be … developed through activity comparable in rigor and dedication to the process by which traditional religious convictions are formulated." Army opp. 9. The respondent supports this assertion by citing

AR 0073, the report of the Chaplain who interviewed Mr. Aguayo as part of the CO application process.  The Chaplain's report neither describes the process by which Mr. Aguayo developed his beliefs nor opines that the development of his religious scruples was not comparable to that of many people who hold traditional religious beliefs.

The process through which Mr. Aguayo developed his beliefs started in childhood.  He was raised by a Catholic mother and Jehovah's Witness father, whom he described as "an extreme pacifist."  AR 0097.  Because of his upbringing, Mr. Aguayo entered the Army with a "concern about his ability to take a life in combat.  He did however join the Army as a medic, thinking that it would lesson his conflict.  SPC Aguayo said that he thought he would be able to work through his conflict with taking a life in combat."  AR 0073 (Chaplain report).  Unfortunately, he was unable to work through the conflict.  Instead, after being exposed to the realities training for war, he "finally understood on a deep level the things my father was trying to teach me based on the religious affiliation of my family while I was growing up."  AR 0120.

The process through which Mr. Aguayo developed his beliefs is, in fact, comparable to several forms of the religious conversion experience.  Some religious people experience dramatic conversions over a short period of time, like St. Paul on the road to Damascus.  Acts 9:1-15; *compare* Book of Ruth 1:15-18 (adoption of recently deceased husband's religion, 10 years after marriage, for love of mother-in-law).  The experience of being instantaneously "born again," at a revival meeting or through contact with some other form of

evangelism, is also well recognized.  On the other hand, some develop their beliefs only after much study; others, through prayer and contemplation; others, primarily through experience.  See, *e.g.,* St. Augustine, *The Confessions* (397-401 A.D.); John Bunyan, *Pilgrim's Progress* (pt. I, 1678; pt. II, 1684).  In some cases where there is a "rigorous" process of study, it may *follow* the adoption of the belief system, rather than precede it.  *E.g.,* Sammy Davis, Jr., *Yes I Can* 210-13, 238 (1965) (conversion to Judaism inspired by happenstance hospital conversations with rabbi; study followed).  Most Americans probably acquire their religious beliefs by a non-rigorous process of parental instruction and influence, childhood Sunday school, and adult church-going.  Any of these processes may be "rigorous" in some sense, but equally may not.

Most important, there is no standard "methodology."  *See generally* James Fowler, *Stages of Faith* (1981); William James, *The Varieties of Religious Experience* (1907)[9]; Rambo, "Conversion," in 4 The Encyclopedia of Religion 73 (M. Eliade, ed., 1987) (conversion viewed as "dynamic, multifaceted process of change.  For some, that change will be abrupt and radical; for others, it will be gradual").  Agustín Aguayo's "conversion experience" fits well within this framework.  His religious training as a child formed the foundation of a sudden "revelation" experience that he initially tried to deny, but which he ultimately

---

[9] James's classic lectures discuss (*inter alia*) whether instantaneous conversions are the only authentic kind, as Wesley argued.  James concludes not:  "[I] suspect that what makes the difference between a sudden and a gradual convert is not necessarily the presence of divine miracle in the case of one and of something less divine in that of the other, but rather a simply psychological peculiarity, the fact, namely, that in the recipient of the more instantaneous grace we have one of those Subjects who are in possession of a large region in which mental work can go on subliminally, and from which invasive experiences, abruptly upsetting the equilibrium of the primary consciousness, may come."  *Id.,* lect. 10, at 194 (Collier 1961).

realized he had no choice but to accept.  For these reasons, there is no basis in fact to support the second reason proffered by respondent's counsel.

The third "reason" advanced by the Army's lawyers is that "Evidence also suggests that petitioner may have entered the Army with the same beliefs he has now, which – as stated in the regulation – is not considered favorable.  See AR 0073; Army Reg 600-43, 1-7.a.(1)."  Army opp. 9.  There is no basis for such a conclusion, which even respondent's counsel seem to concede would be speculation.  It is true that when Mr. Aguayo enlisted in the Army, he had already questioned the morality of war and had a "concern about his ability to take a life in combat."  AR 0073 (Chaplain report).  While those pre-existing beliefs formed the basis of his eventual conscientious objection, when he enlisted, Mr. Aguayo "though he would be able to work through his conflict with taking a life in combat."  AR 0073.  Although he realized almost immediately after enlisting that he had "made a mistake," AR 0097, "he continued to try to do his job the best that he could because, in his own words, he did not want to disappoint his family or his fellow soldiers.  His objection was one that grew over time beginning in basic training and solidifying during the Convoy Livefire Exercises during gunnery October 2003."  AR 0053 (Investigating Officer's report).

In other words, while Mr. Aguayo had *incipient* conscientious objector beliefs prior to his enlistment, these would not have qualified him for conscientious objector status, because they were neither "firm" nor "fixed." AReg 600-43, Glossary Section II (defining "conscientious objection"), and 600-

43 ¶ 1-7.*a*.(1) (pre-existing conscientious objection beliefs which did not become "fixed" until after enlistment are not disqualifying).  As the D.C. Circuit has recognized, because these pre-existing beliefs would not have qualified him for conscientious objector status, they do not disqualify him for it now.  AReg 600-43, ¶ 1-7.a.(1) precludes only applicants whose pre-existing beliefs would have *qualified* them for conscientious objector status.  See *Barr,* 443 F.2d 707 (pre-existing belief  that was not "firm" or "fixed" did not provide basis in fact to deny application).  While a CO may not enlist in order to receive certain benefits (such as a professional or technical education) and then apply for and receive a discharge as a CO once his education is complete, see *Nurnberg v. Froehlke*, 489 F.2d 843 (2d Cir. 1973), nothing like that happened in this case.  Mr. Aguayo was not a CO when he enlisted in good faith.  For these reasons, there is no basis in fact to support the third reason proffered by the respondent's counsel.

The fourth reason advanced by the Army's lawyers is that Mr. Aguayo does not sincerely hold his stated beliefs.  Army opp. 9.  This reason, of course, stands in sharp tension with the others that are proffered.  Counsel for the respondent suggest that several bases in fact in the record would support such a finding.  The first one they offer is the fact that when he enlisted, Mr. Aguayo "thought his work as a soldier and medic would be 'performing humanitarian missions.'  AR 0083."  Counsel for the respondent concede that Mr. Aguayo "may" have held such a view, and offer no citation to the record to support a finding that he did not.  Nevertheless, they find it difficult to believe that

anyone could be so naïve "in the post-September 11, 2001 era."  Army opp. 9.

Being naïve is, of course, no reason to doubt Mr. Aguayo's sincerity.  Moreover,

if it is naïve to believe that serving as a medic is a "humanitarian mission,"

then Mr. Aguayo is not alone.  Both Lt. Col. Risch and Lt. Col. Sinclair seem to

have a similar view of the role of the medic.  AR 0047 (Risch:  "He has not

persuasively shown how is duties as a medic are incompatible with his newly

discovered beliefs); AR 0057 (Sinclair: "PFC Aguayo's MOS, 91W [*i.e.,* "medic"],

supports his desire to help people").  In contrast, Mr. Aguayo has come to the

belief that he cannot serve even as a medic, because he would be "assisting the

injured to later go back to a combat area."  AR 0095. [10]

　　　Next, respondent's attorneys suggest that Mr. Aguayo is insincere,

because SPC Lopez testified at the CO hearing that Mr. Aguayo "'did not want

to shoot his weapon during training for OIF-2 unless he absolutely had to.'"

Army opp. 9 (emphasis supplied by respondent's counsel).  "OIF-2" refers to the

training Mr. Aguayo received prior to his deployment to Iraq ("Operation Iraqi

Freedom").  While counsel for the respondent seem to interpret this statement

to mean that Mr. Aguayo actually *wanted* to shoot his weapon if he absolutely

had to, that is clearly not what SPC Lopez meant by his testimony.  The clear

meaning of the testimony is that Mr. Aguayo never wanted to shoot his weapon

during the training and that the only reason he shot it at all was that he had

---

[10]  There is no requirement in the regulation that the CO's particular current assignment be incompatible with his newly developed religious beliefs.  What is required is that his changed beliefs now cause him to be firmly opposed to his own participation in war in any form.  Consistent with Mr. Aguayo's expression, the regulation thus properly (and correctly) *assumes* that *every* assignment within the Army contributes to any war effort and thus constitutes such "participation."  Accordingly, if the applicant holds qualifying beliefs, the Army must discharge him -- not find him a different assignment.

been ordered to do so.  Since Mr. Aguayo did not submit his application for
discharge until two days before his deployment, AR 0099, this training
occurred prior to his submitting his CO application.  Because he had not yet
submitted his application, he was not protected at the time by the provision of
AReg 600-43 which restricts CO applicants from being assigned duty which
more than minimally conflicts with their beliefs.  ¶ 2-10.*a.*  Had Mr. Aguayo
refused to shoot his weapon during that training, he could have been court-
martialed.  His willingness to conform to the law (under compulsion) as well as
with his deeply-held beliefs is no reason to doubt his sincerity.  See, *e.g., Gruca
v. Secretary of the Army,* 436 F.2d 239, 243 (D.C. Cir. 1970) (refusing to
approve inference of insincerity based on Selective Service registrant's failure to
refuse induction – and thus risk prosecution – after draft board denied CO
exemption).  What respondent's counsel are suggesting is the classic "Catch-
22."  They do not believe a soldier should be granted CO status unless he
violates military law and subjects himself to punishment by court-martial.  Of
course, if a solider were to do that, he would probably not be discharged as a
conscientious objector either.  Because conscientious objector beliefs are not a
defense in a court martial, see *United States v. Lenox, 2*1 USCMA 314, 319,
45CMR 88, 93 (1972) (where conscientious objector regulation creates no right
to refuse military duties, its violation creates no defense to disobedience of
orders),[11] he would likely receive a punitive discharge amounting to a criminal

---

[11]  In *Parisi v. Davidson*, the Supreme Court noted earlier uncertainty on this point in the military criminal court
system.  405 U.S. at 42-43.

conviction.  See, *e.g.*, *Cole v. Commanding Officer U.S.S. Spear*, 747 F.2d 217

(4th Cir. 1984) (en banc) (Navy stopped processing CO application and court-

martialed habeas petitioner after she refused to wear her uniform).[12]

Next, respondent's counsel suggest that Mr. Aguayo is not sincere,

because "His opinions were not formed, or even considered for that matter,

until after he learned that his unit was activated for service in Iraq.  <u>See</u> AR

0073."  Army opp. 9.  The respondent's citation to the Chaplain's report

provides no support for this outlandish and false claim.  Instead, the Chaplain

(who concludes that Mr. Aguayo is sincere) states that Mr. Aguayo had nascent

anti-war beliefs prior to his enlistment and that those beliefs became progres-

sively stronger as Mr. Aguayo underwent military training.  The Chaplain does

state that Mr. Aguayo filed his application only days before deployment – but

he never claims that Mr. Aguayo had not formed his opinions or even consid-

ered them before then.  There is no basis in fact in the record for counsel's

claim.

Next, the Army's counsel suggest that Mr. Aguayo is not sincere, because

he "did not highlight any actions in support of his new beliefs other than

pursuing discharge from the military.  AR 0073."  Army opp. 10.  While the

Chaplain who interviewed Mr. Aguayo did not "highlight" any such actions in

*his* report, which the respondent cites, it is not true that Mr. Aguayo provided

---

[12]  On the other hand, if Mr. Aguayo were to be court-martialed for an act arising out of his conscientious objection, and this or another Court were later to hold that his discharge had been wrongly denied, the court martial conviction would have to be vacated.  See *Parisi v. Davidson*, 405 U.S. at 46 n.15.

no such evidence.  Mr. Aguayo in his application for discharge discusses

several  examples of personal actions reflective of his CO beliefs:

> My day to day behaviors and activities towards others reflect my beliefs
> and convictions.  In my family, we are respectful towards each other.  I
> highly regard to instill this in my children.  We do not tolerate violence
> among our children.  I am not violent towards my wife or she towards
> me.  We are respectful of each other and others.  I make a conscien[tious]
> effort to avoid confrontations and conflict among my family, peers, and
> any persons be known or unknown.  I practice the Golden Rule:  "Prac-
> tice unto others as you wish upon yourself."  I avoid violent movies and
> entertainment.  I try to avoid the more warlike aspects of training.  I will
> always try to act in accordance with my beliefs.

AR 0102.  More significant, however, is Mr. Aguayo's rebuttal in which he

states that:

> When I was in Iraq I was required to perform guard duty and to
> carry a gun − but I refused to load my weapon.  I made the choice
> to appear to be armed (and therefore to be more of a target) even
> though I was not in fact armed, rather than take the chance that I
> might hurt someone.

AR 0120.  It is simply not true that the record does not show how his actions

support his beliefs.  By going unarmed in a war zone, Mr. Aguayo risked his life

for his beliefs.  There is no basis the record to support counsel's claim.

Next, respondent asserts that "Despite petitioner's allegations, the record

demonstrates that in June 2005, SPC Aguayo still fired his weapon at the firing

range and he did not raise a single objection to doing so.  Ex. C."  Army opp.

10.[13]  The record contains no basis for this allegation.  Respondent offers no

---

[13] The petitioner notes that June 2005 was after the Army had denied Mr. Aguayo's CO
application, AR 0044, but before he filed his initial habeas petition and before the Army agreed
to consider his application *de novo*.  Thus, in June 2005, Mr. Aguayo would not have been
protected by AReg 600-43's restrictions applicable to pending CO claims and could have been
court-martialed for disobeying an order requiring him to participate in such training.

citation to the record to support this claim.  Instead, the Army cites "Ex. C" –
an exhibit of an unknown nature which was neither filed with the Court nor
served on undersigned counsel.  It is unclear when this "exhibit" was created,
why it was created, who created it, or even what it actually says.  One thing it
clear, however.  Whatever this "exhibit" is, it is not part of the record on which
the DACORB made its decision.  More important, since this Court's review is
limited to the record before the DACORB, the Court should not permit the
respondent to file this exhibit.  See *Silberberg v. Willis,* 420 F.2d at 665 (district
court limited to consideration of evidence in administrative record); *Armstrong
v. Laird,* 456 F.2d at 522 (same); *Keefer v. United States,* 313 F.2d at 776
(same); *Zelman v. Carpenter,* 457 F.2d at 622 (same); and *Helwick v. Laird,* 438
F.2d at 965 (same).  However, should the Court decide to consider this
supposed exhibit – it should permit the petitioner to file a responsive affidavit,
or to allow Mr. Aguayo to testify at an evidentiary hearing.

Next, the Army's attorneys claim that insincerity is demonstrated by the
timing of Mr. Aguayo's application and the fact that a friend of his had also
applied for CO status.  Army opp. 10.  The fact that a friend also applied for CO
discharge proves nothing.  There is no logical basis to find a Mr. Aguayo insin-
cere simply because a friend applied for CO status.  "Timing" can sometimes
raise suspicions that a soldier is simply using the CO application to avoid a
dangerous assignment.  However, because deployment to a war zone can also
be a legitimate catalyst for a change in beliefs, the Court of Appeals has held –
and the Army's own regulation provides – that timing alone can never form a

basis on which to deny an application.  See *Dietrich v. Tarleton*, 473 F.3d 177,

179 (D.C. Cir. 1972); AReg 500-43 ¶ 1-7.*a*.(5)*(c)*.  In this case, the timing of Mr.

Aguayo's application proves nothing.  As he explained to the investigating

officer (and as the investigating officer apparently accepted), the only reason he

did not apply for discharge sooner was the he did not find out about the CO

option until a "few days" before he submitted his application.  AR 0083.  More-

over, Mr. Aguayo did not apply for CO discharge to avoid deployment to Iraq.

He knew from the beginning that applying for the discharge would not stop the

deployment.  AR 0119-20.  Mr. Aguayo's concern has never been for his own

safety (or else he would not have performed guard duty in Iraq with an

unloaded weapon).  Instead, his only concern has been not to be put in a posi-

tion where he might harm someone else.  The timing of Mr. Aguayo's applica-

tion provided the DACORB no basis to deny his application.[14]

In a footnote, the respondent questions the "firmness" and "nature" of

Mr. Aguayo's beliefs, because "In his amended petition, it states that if he 'is

required to continue to serve in the United States Army, he will have to choose

between participating in the military and following the deeply-held beliefs

which guide his life.'"  Army opp. 10 n.4.  The cited portion of the amended

petition proves nothing.  First, it says nothing about the "firmness" or "nature"

---

[14] As part of its timing argument, the respondent's attorneys note that Mr. Aguayo enlisted
despite his "religious upbringing," Army opp. 10, his knowledge that "the Army's mission is to
defend this nation," *id.,* and the fact that hostilities "had already begun."  *Id.*  The petitioner is
unclear what these facts have to do with the timing of his application.  The fact that he enlisted
under these conditions simply demonstrates that he was not a conscientious objector at that
time.  Had he been, he would not be entitled to be discharged as one now.  AR 600-43, ¶ 1-
7.*a*.(1).

of Mr. Aguayo's beliefs.  It simply states the logical truth that if this Court

denies the petition, Mr. Aguayo will be faced with a choice of following his

beliefs or risk a criminal conviction and imprisonment.  By calling it a "choice,"

the quoted averment does not imply that Mr. Aguayo is uncertain how he

would resolve that dilemma.  Second, because this allegation played no part in

the DACORB's decision, this Court may not consider it as a basis in fact to

support the DACORB decision.  *See* argument at 17-19, *ante.*

Next, the Army's attorneys repeat the argument, *see* Army opp. 9, that

Mr. Aguayo held qualifying beliefs when he enlisted.  No further reply on that

point is warranted.  See argument at 25-26, *ante.*

Finally, the respondent's counsel suggest, almost as an afterthought,

that "if this Court determines that it needs additional 'reasons' because of the

unique circumstances of this case, the DACORB issued a more detailed memo-

randum of March 24, 2006.  Ex. B." Army opp. 12.[15]  The respondent then

makes no effort to demonstrate a basis in fact in the record for any of these

"reasons."  This argument demonstrates only that the respondent's counsel are

not confident that the reasons listed in the March 24 letter are really why the

DACORB denied Mr. Aguayo's application.  Because the question before this

Court is whether there is a basis in fact in the record to support the *actual*

*reasons* the DACORB denied Mr. Aguayo's application for discharge, if the

---

[15] Although counsel for the respondent claim that the "reasons" listed in the March 24 letter
are "additional," Army opp. 12, in fact, they are paraphrases of the reasons raised and
discussed by the respondent earlier in its opposition memorandum and already responded to
in this traverse.  *See* pp. 21-25 (religious "underpinning"), 21-25 (source of beliefs), 25-26
(beliefs crystallized prior to enlistment), and 31-32 (timing).  No further response is called for.

respondent's counsel believed them to be the reasons, they would have been made the focus of the Army's opposition.  If this Court could be confident that the reasons listed in the March 24 letter were the reasons the DACORB denied relief, then the focus of this case should be on *those* reasons – not the *post hac* reasons imagined by the respondent's counsel.

It is clear, however, that the March 24 reasons are *not* the reasons on which the DACORB relied.  First, the March 24 letter stated that the list of reasons is not complete.  Second, because the list was prepared *months* after the DACORB's decision, was not presented in affidavit form, was never made a part of the record, and was not deemed reliable enough by respondent's counsel to rely on it, this Court should disregard it.  Third, by referencing the March 24 letter in terms of what this Court may feel it "needs," counsel reveal that this document was prepared for the purpose of litigation, and is not the genuine product of an administrative evaluation of the record.  Instead, unless this Court determines that none of the arguments of respondent's counsel amount to a basis in fact, it should schedule an evidentiary hearing to deter-mine the reasons the DACORB denied Mr. Aguayo's claim.  After that hearing and further briefing, the Court should grant the relief requested.

## CONCLUSION

For the reasons explained in this traverse, the Army's denial of Agustín Aguayo's application for discharge as a conscientious objector is not supported by a basis in fact in the record.  The record shows that petitioner is, in fact, a genuine conscientious objector who is entitled to the discharge he sought.  The

Court should issue a writ of habeas corpus ordering the respondent to

discharge the petitioner honorably as a conscientious objector forthwith.

Respectfully submitted,

Dated:  May 5, 2006                    s/James H. Feldman, Jr.
                                       JAMES H. FELDMAN, JR. (PA Bar # 36345)
LOCAL COUNSEL:                         PETER GOLDBERGER (PA Bar #22364)
                                       LAW OFFICE OF PETER GOLDBERGER
s/ James R. Klimaski                   50 Rittenhouse Place
JAMES R. KLIMASKI                      Ardmore, PA  19003
(DC Bar No. 243543)
KLIMASKI & ASSOCIATES, P.C.             (610) 649-8200
1819 L Street, NW, 7th Floor            (610) 649-8362 (facsimile)
Washington, DC  20036-3830              AELaw2@aol.com

  (202) 296-5600
  (202) 296-5601 (facsimile)
  Klimaski@Klimaskilaw.com

Attorneys for the Petitioner