United States District Court<br>For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MENACHEM A. BENJUDAH,<br><br>　　Petitioner,<br><br>　v.<br><br>FRANCIS J. HARVEY, Secretary of the Army, and LT. COL. MICHAEL CHINN, Commander, 229 MILITARY INTELLIGENCE BATTALION,<br><br>　　Respondents.<br>　　　　　　　　　　　　　　　　　　／ | No. C 05-00399 WHA<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

### INTRODUCTION

Petitioner Menachem A. BenJudah is allegedly in "military custody," as an enlisted member of the United States Army. He seeks habeas corpus relief under 28 U.S.C. 2241 on the ground that his application for discharge as a conscientious objector was wrongfully denied. This order finds sufficient evidence in the record to affirm the denial of petitioner's conscientious objector application. The habeas petition is thus **DENIED**.

### STATEMENT

Petitioner enlisted in the Army on October 11, 2001, agreeing to serve five years on active duty and an additional three years in the Army Reserves (AR 119). He also certified that he did not then have, nor had he ever had "a firm, fixed, and sincere objection to participation in war in any form or to the bearing of arms because of religious belief or training" (AR 124). Petitioner began active duty on February 25, 2002 (AR 81, 114). He was assigned to study

modern Arabic at the Defensive Language Institute, starting on March 27, 2003 and scheduled to end on or about July 15, 2004 (AR 111-12).[1]

On June 29, 2004, petitioner started his application for discharge as a conscientious objector by providing the information required by Appendix B to Army Regulation 600-43 (AR 39-42, repeated at AR 58-61). His DA Form 4187, however, was not signed until July 20, 2004 (AR 37, repeated at AR 55). An undated letter from his mother was also included (AR 76). In his application, petitioner argued he had strong religious beliefs and could not "continue to be part of an organization where [he was] supposed to kill people for a living" (AR 41). He elaborated (*ibid.*):

> If ever I was put in a situation to kill someone, I couldn't possibly force myself to do such a thing. My personal convictions will not allow that. I can not speak for anyone other than myself. I do not have the desire to speak for anyone other than myself, and I respect everyone else in his or her own decisions. The fact is that I believe with all of my heart that God would not have me take another man's life.

Yet, at the same time, he conceded that there might be some circumstances when he could conceive of using force, as long as it "does not, in any way, consist of taking one's life;" for example, "[i]n a situation such as my family being threatened, of course I would do everything in my power to protect them without killing anyone" (*ibid.*).

Captain Joseph Jeffries, the army chaplain for the 229th Military Intelligence Battalion, interviewed petitioner on July 7, 2004 (AR 43-44, repeated at AR 62-63). Chaplain Jeffries found that petitioner "was very sincere about being totally opposed to taking the life of another individual" (AR 43). He further commented that this realization apparently "came after the topic was brought up in class by another student" (*ibid.*). Chaplain Jeffries commented that this was the motivation for his application, rather than "something that was constantly weighing heavily on his mind and heart;" in other words, "[t]he idea came about after other opinions and not so much of his own" (AR 44). He also observed that petitioner's beliefs were "not based on a religious conviction but rather on his own individual choice" (*ibid.*). In accordance with regulations, he made no recommendation for approval or for disapproval of the application. On

---

[1] It is unclear from the record when the course actually ended. The Army contends that petitioner had completed 56 weeks of the 63-week course when he applied for conscientious objector status (AR 8).

2

July 15, 2004, petitioner was examined by Dr. Lorin Frank, a clinical psychologist, who found that he did not suffer from any psychological impairments (AR 46, repeated at AR 64).

Captain Timothy L. Savidge was appointed to be the investigating officer (AR 3, repeated at AR 54). He conducted an investigation in accordance with regulations, interviewing numerous individuals regarding petitioner's application (AR 4-6, 21-25, 31-34, 65-70, 72-75, 78-79). Captain Savidge submitted his findings on August 17, 2004, recommending disapproval of petitioner's conscientious objector application, because he failed to demonstrate genuine sincerity (AR 49-52). First, his beliefs were based "solely on his personal interpretation of God's will onto himself and not the belief of the religion or the church he attends," which was also confirmed by petitioner's pastor (AR 51, *see also* AR 18-19, 65-66, 71). Second, petitioner initially claimed that he got the idea to apply for conscientious objector status "from someone in class," but after his classmates denied this, he changed his story and stated that heard about the process from "PFC [Christine] Mittman while he was in Company C" (AR 51). Captain Savidge concluded that "SPC BenJudah was either trying to hide something or reluctant to disclose details because PFC Mittman's name only arose during the investigation even though he thought about this for some time" (*ibid.*). Moreover, he found that petitioner did not show genuine sincerity because "he continues to work side by side with soldiers who are responsible for taking lives without showing any sign of distress, discomfort, or change in demeanor" and based on the timing of petitioner's application (*ibid.*).

Petitioner waived his administrative hearing (AR 80). His file was reviewed by the Staff Judge Advocate, Captain Young J. Park, on August 18, 2004 (AR 48). Captain Park found that "sufficient evidence support[ed] the findings" and recommendations of Captain Savidge (*ibid.*).

On September 7, 2004, petitioner acknowledged receipt of the administrative record (AR 30). He appended a rebuttal letter dated September 3, 2004 (AR 26-28). On September 7, 2004, company commander Captain Jose Pereira reviewed the file and recommended granting of 1-A-0 status in lieu of 1-0 status (AR 29).[2] Captain Pereira based this recommendation on

---

[2] Persons successfully demonstrating that they are conscientious objectors either qualify for 1-0 status (*i.e.*, discharge) or 1-A-0 status (*i.e.*, classification as a noncombatant).

3

the timing of petitioner's application, his voluntary enlistment during a time when "threats of war were abundantly obvious" and his statement that "he wants to serve his country but can not carry a weapon or take a life," noting that these wishes could be respected under 1-A-0 status (*ibid.*).  On September 14, 2004, Captain Savidge responded to petitioner's rebuttal by amending his findings of petitioner's reluctance to reveal information regarding PFC Mittman (AR 7).  He emphasized that "[t]hese findings do not change [his] recommendation" of disapproval (*ibid.*).  On September 15, 2004, Captain Pereira submitted a revised report, retracting his recommendation of granting 1-A-0 status (AR 8).  On the same day, Lieutenant Colonel Michael Chinn concurred with Captain Savidge's recommendation that petitioner's application be denied (AR 9-10).  He noted that petitioner had failed to demonstrate that his beliefs were supported by the teachings of his church, the teachings at his home or his pattern of conduct (AR 9).  Lieutenant Colonel Chinn also observed that some of the statements from petitioner's colleagues suggested that he had a history of discontent with the Army and with his language training, although the timing of his application coincided with his eligibility for certain veterans' benefits such as the Montgomery GI Bill (*ibid.*).[3]

On September 20, 2004, Captain Park again reviewed the file (AR 11-13).  He recommended disapproval of petitioner's request for discharge based on the following reasons: (1) the findings of the chaplain and the other officers in the chain of command; (2) some of petitioner's classmates had questioned the sincerity of his application; (3) his feelings were based on his own personal interpretations of God's will rather than the teachings of his church; (4) he stated a willingness to use force to defend his family, short of taking someone's life; (5) the timing of his application; and (6) he was not suffering from any psychological disorder that would otherwise justify discharge (AR 12).  In an undated form, the Commander of the Defense Language Institute, Colonel Michael Simone also recommended disapproval of petitioner's application because he had failed to establish his claim by clear and convincing evidence (AR 20).

---

[3] Although petitioner later asserted that he was not interested in receiving any veterans' benefits, he admitted that he had signed up for the GI bill (*compare* AR 16 with AR 35).

4

1      On October 7, 2004, petitioner submitted a second rebuttal, appending a letter from his
2 pastor (AR 14-19).  He again indicated that he "could never fight in a war, or take the life of
3 anyone into [his] own hands" and stressed that he "could never kill anyone, no matter the
4 circumstances" (AR 14).  Indeed, he asserted that he was "a different person" from the last time
5 he pulled a trigger and could "never pick up a weapon again" (AR 16).  Petitioner also retracted
6 his earlier statements about using force to protect his family, saying that if his family were
7 threatened, "the only thing that [he] would do in their defense would be turning to God" (*ibid.*).
8 He also asserted that he no longer believed that he had to earn his right to American freedoms
9 and liberties "by serving in the military and killing for the Army's cause" (AR 17).

10     On November 23, 2004, the Department of the Army Conscientious Objector Review
11 Board (DACORB) issued its final decision (AR 1).  Colonel Donald W. Browne, Jr., writing on
12 behalf of the Secretary of the Army, determined that petitioner "did not present convincing
13 evidence . . . that [his] stated beliefs warrant award of 1-0 status" (*ibid.*).  On January 21, 2005,
14 petitioner received orders to report to Fort Campbell, Kentucky by February 10, 2005 (AR 82).
15 He filed his petition for writ of habeas corpus on January 27, 2005.  The opposition was filed on
16 February 18, 2005, and petitioner's traverse followed on March 7, 2005.

**ANALYSIS**

18     "A conscientious objector has no constitutional or statutory right to be discharged from
19 active service after voluntary enlistment." *Roby v. United States Dep't of the Navy*, 76 F.3d
20 1052, 1055 (9th Cir.1996).  Like other branches of the military, the Army has recognized that
21 beliefs against any participation in war or the bearing of arms may not become fixed until after
22 the person has already made a commitment to military service and has established a procedure
23 for considering such claims.  *See* Army Regulation 600-43 (provided as Opp. Exh. A).  During
24 this process, the burden is upon applicants to demonstrate by clear and convincing evidence that
25 their sincere and deeply-held beliefs would qualify them for conscientious objector status.  *Id.* at
26 1-7(c). Applicants claiming 1-0 status (*i.e.*, discharge) will not be granted 1-A-0 status
27 (*i.e.*, classification as a noncombatant) as a compromise; conversely, those applying for 1-A-0
28 status will not be granted 1-0 status.  *Id.* at 1-7(d).

5

The parties agree that the standard of review for a denial of an application for conscientious objector status is the "basis-in-fact" test. This is "the narrowest review known to the law," so the Court must show utmost deference and affirm as long as the record reveals "some proof that is incompatible with the applicant's claims." *Koh v. Secretary of the Air Force*, 719 F.2d 1384, 1385 (9th Cir. 1983)(citations omitted). Because the ultimate question in conscientious objector cases is often the sincerity of the applicant, the administrative record is reviewed for *some* evidence to support the military's overt or implicit finding of insincerity or bad faith. This "means more than suspicion and speculation" but less than "substantial evidence." Even if individual findings would not separately constitute a basis in fact, when considered together they could. *Woods v. Sheehan*, 987 F.2d 1454, 1457-58 (9th Cir. 1993).

Petitioner argues that each of the reasons asserted was not sufficiently supported by a basis in fact, or in the alternative, that the DACORB decision should have explicitly outlined the reasons for denial of his application. The Court is not persuaded by either argument.

With regard to the latter point, the DACORB reached its decision "[a]fter thorough examination of the Case Record," which included numerous recommendations to disapprove petitioner's application. It would be pointless to remand the case, as petitioner suggests, simply for the DACORB to regurgitate all of the reasons for denial outlined in the recommendations from different officers.

As for the facts that were incompatible with petitioner's claim for 1-0 status, the opposition pointed to various examples from the record. These included: (1) timing of petitioner's application; (2) statements from his classmates that his application may have been motivated by dissatisfaction with the Army or with his language course; (3) the fact that he was less than forthcoming regarding his contacts with PFC Mittman; (4) that his beliefs did not arise from teachings of his church; (5) that the chaplain felt that his application was based on individual choice rather than religious conviction; (6) that his conduct and behavior appeared inconsistent with his allegedly deeply-held beliefs; and (7) that none of petitioner's colleagues supported his application (Opp. 7-8).

6

Petitioner attacks each of these reasons, essentially arguing that there was insufficient basis in the record to support these findings (Trav. 19-31). This order disagrees. Even if some of the individual findings would not have separately constituted a basis in fact, certainly when considered as a whole, the record was sufficient to support the finding of insincerity. In short, there is "some proof that is incompatible with the applicant's claims." *Koh*, 719 F.2d at 1385.

Moreover, petitioner overlooks the fact that it was *his* burden to show by clear and convincing evidence that his beliefs *against participating in war in any capacity* were both sincere and deeply-held. At most, petitioner may have demonstrated that he did not feel that he could *personally* kill another man (AR 14, 41). Chaplain Jeffries did not doubt the sincerity of petitioner's claim that he was "totally opposed to taking the life of another individual" (AR 43). Yet, petitioner never explained why he could not remain in the Army as a noncombatant. The most he claimed was that he did not wish "to be part of an organization" where *he* was supposed to kill people for a living (AR 41). The record also supported the finding that petitioner did not wish to speak for anyone but himself and appeared capable of continuing to work alongside his colleagues with no signs of distress, discomfort, or change in demeanor (AR 51). As Captain Pereira observed, petitioner may have been successful had he applied for 1-A-0 status (AR 29). Unfortunately, granting 1-A-0 status in lieu of 1-0 status would have been in violation of provision 1-7(d) of Army Regulation 600-43.

In summary, this order finds ample evidence in the record to support the Army's finding that petitioner failed to demonstrate by clear and convincing evidence that he qualified for 1-0 status as a conscientious objector.

## CONCLUSION

For these reasons, the petition is **DENIED**. Judgment will be entered accordingly.

**IT IS SO ORDERED.**

Dated: March 21, 2005

/S/ WILLIAM ALSUP
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

7